CITY OF CARMEL–BY–THE–SEA; Monterey Peninsula Regional Park District; Hatton Canyon Coalition; Sierra Club, Plaintiffs–Appellants,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; Admiral James Busey; Federal Highway Administration; Thomas D. Larson; California Department of Transportation; James Van Loben Sels; Thomas L. Pollock; et al., Defendants–Appellees.

No. 94–16234.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided Sept. 13, 1996.

Withdrawn Aug. 19, 1997.

Decided Aug. 19, 1997.

---

Rachel B. Hooper, Shute, Mihaly & Weinberger, San Francisco, CA, for plaintiffs-appellants.

Martin W. Matzen and Joan M. Pepin, United States Department of Justice, Washington, DC, and Antonio R. Anziano, San Francisco, CA, for defendants-appellees.

Before: NORRIS, BEEZER and TROTT, Circuit Judges.

BEEZER, Circuit Judge:

### ORDER

The Opinion filed September 13, 1996, is withdrawn.

### OPINION

This appeal arises from the proposed realignment of California State Highway 1 from the City of Carmel–by–the–Sea to nearby Hatton Canyon. The responsible governmental agencies studied this proposal and others and issued an Environmental Impact Statement/Report as required by state and federal law.

Plaintiffs City of Carmel–by–the–Sea, Monterey Peninsula Regional Park District, Hatton Canyon Coalition and Sierra Club challenged the adequacy of this statement/report under the National Environmental Policy Act, California Environmental Quality Act and Executive Orders 11988 and 11990. The district court granted summary judgment in favor of the defendants. Plaintiffs filed this timely appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part and remand.

### I

California State Highway 1 (Highway 1) extends from San Clemente in Orange County to Rockport in Mendocino County, California. Over an approximately three-mile stretch through the City of Carmel–by–the–Sea (City of Carmel), motorists traveling on Highway 1 confront severe congestion at peak hours. Highway 1 begins as a four-lane divided highway at the northern end of this section, near the Highway 68 interchange. As Highway 1 passes through the City of Carmel it funnels into a two-lane undivided highway, south of Ocean Avenue. Over the next several miles Highway 1 is controlled,

and congested, by three traffic lights and numerous flanking intersections and driveways. The lack of sufficient left-turning lanes adds to the traffic problem.

California transportation officials list this stretch of Highway 1 as: "one of the most heavily traveled two-lane highways in the State." 7 SAR 2083.[1] This section of Highway 1 is also dangerous: the rate of traffic accidents in this two-lane section of Highway 1 exceeds the state average. 24 SAR 7652. In 1990, traffic reached an average of 40,000 cars per day and an average of 60,000 cars per day at one location on this stretch. 24 SAR 7650. This volume increases during weekends and the summer months. 24 SAR 7651.

Highway 1's traffic problems date back to the late 1940's. No one today disputes the need for improvements; rather, disagreement centers on how best to achieve those improvements. Variations on two alternative proposals have dominated the list of solutions for forty years: (1) widen Highway 1 or (2) build a new route. The primary location identified for a new route was, and remains, Hatton Canyon, a pristine "wilderness" area east of the City of Carmel. Disagreement over these alternatives has resulted, unwittingly, in the exercise of a third option: no action.

The Highway 1 debate has been both public and passionate. The 10,000-page administrative record is replete with evidence of the detailed and emotional attention this issue has received. Further complicating the process, several localities, agencies and environmental groups involved have reversed their positions on the issue over time. Many who once supported the Hatton Canyon proposal now vigorously oppose it. They argue that the proposal will destroy Hatton Canyon's unique ecosystem while only saving motorists a few minutes of driving time at peak hours. Not surprisingly proponents of the Hatton Canyon proposal dismiss this as hyperbole, and note instead that the Hatton Canyon project will ameliorate traffic congestion, accident rates and air quality, while maintaining the rural and scenic character of Highway 1.

In 1984, the California Department of Transportation (Caltrans) and the Federal Highway Administration began serving jointly as the "lead agencies" on the project. In 1986 they published a combined Draft Environmental Impact Statement/ Environmental Impact Report as required by the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and the California Environmental Quality Act, Cal.Pub.Res.Code § 21000 et seq.[2] The Draft Environmental Impact Statement/Report's stated purpose was to: "improve the capacity of Highway 1 and reduce crossing and turning conflicts associated with several local streets and private driveways." 11 SAR 3121. Several alternatives—primarily variations on the Hatton Canyon and Highway 1 proposals—were analyzed. 11 SAR 3129–52.

The Draft Environmental Impact Statement/Report generated numerous comments from citizens, federal and state agencies, and environmental groups, among others. The Hatton Canyon Coalition, a plaintiff here, submitted a report prepared by Wilbur Smith Associates, an engineering firm, and Skidmore, Owings & Merrill, an architecture/planning firm (Smith Report), which recommended converting Highway 1 into a four-lane highway with two major interchanges. 24 SAR 7389–87.

In 1991, the Federal Highway Administration and Caltrans issued their Final Environmental Impact Statement/Report. The report/statement addressed many of the comments submitted in response to the

---

1. Throughout this opinion, we cite to the state and federal administrative records. State administrative record references use the format: volume number in Arabic numerals, SAR, page numbers. Federal administrative record references use the format volume number in Roman numerals, FAR, page numbers. "FR" refers to the Federal Defendants–Appellees' Supplemental Excerpts of Record; these references are cited as: FR, page number in Arabic numerals.

2. The National Environmental Policy Act requires the preparation of an Environmental Impact Statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The California Environmental Quality Act requires the preparation of an Environmental Impact Report on "any project which they propose to carry out or approve that may have a significant effect on the environment." Cal.Pub.Res.Code § 21100(a).

Draft Environmental Impact Statement/Report and generally provided a more focused analysis. The Final Environmental Impact Statement/Report's "Purpose and Need" section, for example, defined more precisely the desired Level of Service, an industry traffic category, setting Level of Service C as a project goal. 24 SAR 7648. Level of Service C refers to a category of "traffic service," which describes traffic flow. Traffic conditions are ranked between Level of Service A ("free flow, with low volumes and high speeds") and Level of Service F ("forced flow operation at low speeds, where volumes are below capacity").[3]

The Environmental Impact Statement/Report recommended the adoption of Alternative 1C Modified, the Hatton Canyon realignment. This proposal includes a new 57–foot bridge over the Carmel River, two new interchanges and the widening of an intersecting road. 24 SAR 7633. The estimated cost for this proposal was approximately $33.5 million. 24 SAR 7662.

Despite criticism concerning the accuracy of the Environmental Impact Statement/Report, including comments from the Environmental Protection Agency, the Army Corps of Engineers and the Fish and Wildlife Service, the Federal Highway Administration certified the Final Environmental Impact Statement/Report in November, 1991 by issuing its Record of Decision. 27 SAR 8594–

8608. Caltrans followed suit in December, 1991, issuing its Notice of Determination, certifying the Environmental Impact Statement/Report and adopting the findings and statement of overriding considerations required by the California Environmental Quality Act. 27 SAR 8654–55. The California Transportation Commission approved the Hatton Canyon project in November, 28 SAR 9049, and filed a Notice of Determination in December, 1991, 28 SAR 9073. The Federal Highway Administration had previously issued a "Wetlands Only Practicable Alternative Finding," 25 SAR 7981–84, and a "Floodplain Only Practicable Alternative Finding," 25 SAR 7985–88, as required by Executive Orders 11990 and 11988 respectively.

In early 1992, plaintiffs City of Carmel, Monterey Peninsula Regional Park District, Hatton Canyon Coalition and Sierra Club (collectively Carmel) filed this action against the Federal Highway Administration and Caltrans, among others, contending that the Final Environmental Impact Statement/Report violated the National Environmental Policy Act, California Environmental Quality Act and Executive Orders 11988 and 11990.[4] Carmel sought declaratory, injunctive and mandatory relief, as well as costs and attorney's fees pursuant to Cal.Civ.P.Code § 1021.5 and 28 U.S.C. § 2412. The district court granted summary judgment to the de-

---

**3.** The Environmental Impact Statement/Report defined the Level of Service categories as follows:

Level of Service A describes a condition of free flow, with low volumes and high speeds. Traffic density is low, with speeds controlled by driver desires, speed limits and physical roadway conditions.
Level of Service B is in the zone of stable flow, with operating speeds beginning to be restricted somewhat by traffic conditions. Drivers still have reasonable freedom to select their speed and lane.
Level of Service C is still in the zone of stable flow, but speeds and maneuverability are more closely controlled by the higher volumes. Most drives are restricted in their freedom to select their own speed, change lanes, or pass.
Level of Service D approaches unstable flow with tolerable operating speeds being maintained though considerably affected by changes in operating conditions. Fluctuations in volumes and temporary restrictions to flow may cause substantial drops in operating speeds.

Level of Service E cannot be described by speed alone, but represents operations at even lower operating speeds than in level D, with volumes at or near the capacity of the highway. Flow is unstable, and there may be stoppages of momentary duration.
Level of Service F describes the forced flow of operation at low speeds, where the volumes are below capacity. These conditions usually result from queues of vehicles backing up from a reconstruction downstream. Speeds are reduced substantially and stoppages may occur for short or long periods of time because of the downstream congestion. In the extreme, both speeds and volume can drop to zero.
25 SAR 7657.

**4.** Carmel also sued various other state and federal defendants. For the purposes of this opinion, we refer to the state defendants collectively as Caltrans, and the federal defendants collectively as the Federal Highway Administration.

fendants on May 16, 1994. Carmel filed this timely appeal.

## II

 We review de novo the district court's determination that the Final Environmental Impact Statement/Report satisfied the National Environmental Policy Act, *Oregon Natural Resources Council v. Marsh*, 52 F.3d 1485, 1488 (9th Cir.1995), and the California Environmental Quality Act, *see San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus*, 42 Cal.App.4th 608, 49 Cal.Rptr.2d 494, 500 (1996). We also review de novo the district court's determination that the Federal Highway Administration satisfied Executive Orders 11988 and 11990. *See United States v. Washington*, 969 F.2d 752, 754–55 (9th Cir.1992).

## III

Carmel alleges that five parts of the Final Environmental Impact Statement/Report violate both the National Environmental Policy Act and California Environmental Quality Act: (A) the wetlands discussion, (B) the Monterey pine discussion, (C) the consideration of reasonable alternatives, (D) the cumulative impacts analysis, and (E) the growth-inducing effects analysis.

We consider Carmel's National Environmental Policy Act and California Environmental Quality Act challenges independently. Although similar in intent and procedure, *Citizens of Goleta Valley v. Board of Sup'rs of County of Santa Barbara*, 52 Cal.3d 553, 276 Cal.Rptr. 410, 801 P.2d 1161, 1168 n. 4 (1990), these statutes differ in other ways, *see City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir.1975). The National Environmental Policy Act's requirements are procedural, *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 522 n. 1 (9th Cir. 1994); the California Environmental Quality Act has both procedural and substantive elements. *See San Joaquin Raptor/Wildlife*, 49 Cal.Rptr.2d. at 497–98; *see, e.g.,* Cal.Pub. Res.Code §§ 21002.1 (the California Environmental Quality Act imposes an affirmative duty on agencies to protect the environment). Although, we review only procedural concerns under both statutes, each has its own regulations and case law. Not surprisingly,

however, our conclusions under each are identical.

 We address the National Environmental Policy Act claims first, and begin with several guiding principles. One rule bears repeating: the National Environmental Policy Act sets forth procedural mechanisms to ensure proper consideration of environmental concerns, it does not mandate particular substantive results. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1218, 55 L.Ed.2d 460 (1978). In reviewing Carmel's challenge under the National Environmental Policy Act, we will not "substitute [our] judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987).

 The National Environmental Policy Act guards the environment through discussion and disclosure. Chief among the National Environmental Policy Act's procedural safeguards, or "action-forcing" measures, is the Environmental Impact Statement—a detailed statement which discusses:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C). We review an Environmental Impact Statement under the "rule of reason" to determine whether it contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992). We make "a pragmatic judgment whether the [Environmental Impact Statement's] form, content and preparation foster both informed decision-making and informed

public participation." *Id.* (quoting *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982)). "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, [our] review is at an end." *Id.*

We address Carmel's claims in turn.

## A. Wetlands

Carmel challenges the Final Environmental Impact Statement/Report's wetlands discussion as both inaccurate and misleading and thus insufficient under the National Environmental Policy Act. Carmel disputes both the description of the wetlands in terms of the total acreage threatened by the proposed project and the Final Environmental Impact Statement/Report's mitigation plan.

### 1. Wetlands Description

▆ Carmel first argues that the Final Environmental Impact Statement/Report fails to account for new wetlands created by the 1989 Loma Prieta earthquake. The Army Corps of Engineers and the Environmental Protection Agency agree; both questioned the Final Environmental Impact Statement/Report's wetlands estimates. 27 SAR 8562–68 (Army Corps of Engineers letter); 27 SAR 8570–72 (Environmental Protection Agency letter); Ex. 3, Plaintiffs' Req. for Jud. Notice, 3/19/93 (Army Corps of Engineers letter). The Environmental Protection Agency recommends a redelineation of the wetlands due to the Loma Prieta earthquake. 27 SAR 8572. The Army Corps of Engineers points out the Final Environmental Impact Statement/Report's failure to include emergent wetlands in the lower canyon, 27 SAR 8563, and in a subsequent letter states that its own 1987 wetlands survey "is now outdated and has expired" due to "subsequent earth movements." Ex. 3, Plaintiffs' Req. for Jud. Notice, 3/19/93.

▆ Carmel seeks too much from the Environmental Impact Statement/Report; the National Environmental Policy Act requires a "reasonably thorough" discussion of the environmental consequences in question, not unanimity of opinion, expert or otherwise. Agency "concerns" and criticism alone do not undermine the validity of an Environmental Impact Statement. *See Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991). Accurate scientific evidence remains essential to an Environmental Impact Statement, and in *Seattle Audubon Soc. v. Espy,* 998 F.2d 699 (9th Cir.1993), we held that an agency could not rely on "stale" scientific evidence or "ignore reputable scientific criticism" in its Environmental Impact Statement. Nonetheless, when faced with conflicting evidence, an agency may rely on its own evidence.

▆ We defer to the Federal Highway Administration and Caltrans here because the Final Environmental Impact Statement/Report's wetlands discussion is "reasonably thorough." The Final Environmental Impact Statement/Report clearly states that Alternative 1C Modified will result in the permanent removal of almost twelve acres of wetlands. 25 SAR 7791; *see* 25 SAR 7739–40 (total project area includes approximately thirteen acres of wetlands). The Final Environmental Impact Statement/Report characterizes the project's impact on the wetlands as "significant" and concludes that certain riparian wetlands "[cannot] be duplicated to fully provide in-kind replacement of habitat values." 25 SAR 7797.[5] The Final Environmental Impact Statement/Report proposes various means to mitigate these losses; the proposed "conceptual" mitigation plan aspires to replace the removed wetlands at a ratio of "greater than 1:1." 25 SAR 7797.[6] The National Environmental Policy

---

**5.** The term "significant" as used here in the Environmental Impact Statement/Report is a statutory term defined in the California Environmental Quality Act. The California Environmental Quality Act requires that an Environmental Impact Report both identify and describe any "significant" effects on the environment. The controlling *statute defines a "significant effect on the environment"* as a "substantial, or potentially substantially, adverse change in the environment." Cal.Pub.Res.Code § 21068.

**6.** The Federal Highway Administration and Caltrans have previously demonstrated a willingness to change their wetlands estimates, and nothing here suggests that they would not be amenable to further revision in the face of credible evidence. In the "Reevaluation of Draft Environmental Impact Statement" included with the Final Environmental Impact Statement/Report, the Federal Highway Administration incorporated changes that have occurred in their wetlands estimates. The "reevaluation" states:

Act does not require that we settle disputes between scientists, it dictates that we defer to agency opinion if it is not otherwise shown to be arbitrary or capricious. *See Laguna Greenbelt,* 42 F.3d at 526; *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'") (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976)).

Two additional factors alleviate our concern as to possible inaccuracies in the Final Environmental Impact Statement/Report's estimated acreage of threatened wetlands, and other problems resulting from the alleged use of "stale" scientific evidence. First, the mitigation plan seeks to replace removed wetlands on at least a 1:1 ratio. Thus even if the 1989 Loma Prieta earthquake did expand the effected wetlands, removal of any unaccounted for wetlands will be replaced under the mitigation plan. Second, any remaining inaccuracies will be cured in the § 404 permit process under the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations, 33 C.F.R. Parts 320–330; 40 C.F.R. Part 230. Although publication of the Final Environmental Impact Statement/Report is an important step toward the realization of the proposed project, often it is not the final step. Before any wetlands can be removed from Hatton Canyon, the Federal Highway Administration and Caltrans must secure a permit from the Army Corps of Engineers under § 404 of the Clean Water Act. If the objecting agencies remain opposed to the wetlands mitigation plan each can voice its concerns as the permit process evolves. *See United States v. Ellen,* 961 F.2d 462, 464 (4th Cir.1992) (the Army Corps of Engineers and Environmental Protection Agency have authority to make wetlands determinations under the Clean Water Act). Significantly, the critical letters from the Environmental Protection Agency and Army Corps of Engineers, cited above, were aimed at securing improvements in the mitigation plan prior to its submission for a permit. These letters did not attack the Final Environmental Impact Statement/Report as inadequate under the National Environmental Policy Act.[7]

We do not intimate here that further "process" necessarily alleviates an agency's duty under the National Environmental Policy Act. Rather this scenario serves to highlight the distinction between the National Environmental Policy Act and the Clean Water Act: the former is procedural and is simply not as demanding as the Clean Water Act on the issue of wetlands. *See Dubois v. U.S. Dept. of Agriculture,* 102 F.3d 1273, 1294 (1st Cir.1996) ("In contrast to [National Environmental Policy Act's] focus on process, the [Clean Water Act] is substantive, focusing upon the 'integrity of the Nation's Waters, not the permit process.'") (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

### 2. Mitigation Plan

■ Carmel next attacks the proposed wetlands mitigation plan. Carmel claims that the plan misrepresents other agencies' positions, underestimates the difficulties involved, and contains insufficient detail to allow for proper evaluation. Carmel's claim of misrepresentation refers to the Final Environmental Impact Statement/Report state-

---

After circulation of the Draft [Environmental Impact Statement], the Army Corps of Engineers of Engineers (ACOE) delineated the wetland area on the Hatton Canyon drainage and found it to be approximately 10 acres. Mitigation measures were revised to compensate for the wetland acreage delineation by [the Army Corps of Engineers]. A Wetland Mitigation Plan, which will include on-site and off-site mitigation is being developed in coordination with the U.S. Fish and Wildlife Service, Environmental Protection Agency, Army Corps of Engineers, and the California Department of Fish and Game.

25 SAR 7599.

7. For example, the Environmental Protection Agency noted that the Final Environmental Impact Statement/Report's wetlands discussion did not fulfill the § 404(b)(1) Guidelines and thus proposed recommendations to bring the agencies into compliance. 27 SAR 8572. The Army Corps of Engineers explained that the purpose of its letter was to "clarify[ ] concerns regarding the proposed project's impact on the aquatic environment and compliance with the Section 404(b)(1) Guidelines." 27 SAR 8562.

ments that: (a) the "[Fish and Wildlife Service] concurred with the impact assessment and proposed mitigation measures as detailed in the conceptual mitigation plan," 25 SAR 7791, and (b) "maintenance and operation of the riparian restoration would be taken over by the Monterey Peninsula Water Management District under a Cooperative Agreement with Caltrans." 25 SAR 7797. Both the Fish and Wildlife Service and the Monterey Peninsula Water Management District have disputed the accuracy of these statements. The Fish and Wildlife Service now characterizes the mitigation plan as "not sufficient." 27 SAR 8625–26. The Monterey Peninsula Water Management District states that it has never formally agreed to manage the wetlands restoration project. 27 SAR 8500.

Carmel's claims of misrepresentation amount to semantics. The Fish and Wildlife Service has not officially concurred in a "final" mitigation plan for the wetlands, but it did write, in an October 30, 1989 letter, that "[w]e believe proper implementation of the Revised Plan would replace, in-kind, riparian habitat values and acres lost from the construction of Alternative 1C Modified (the Hatton Canyon Alternative)." 25 SAR 7991–92 (Exhibit N). The Fish and Wildlife Service did effectively "concur" in the proposed mitigation plan. Further, any fear of misrepresentation is dispelled by the fact that the Federal Highway Administration and Caltrans included the Fish and Wildlife Service's "concurrence" letter as an exhibit to the Final Environmental Impact Statement/Report and cited to it accurately. Thus the Final Environmental Impact Statement/Report reader, whether an official decisionmaker or private citizen, was free to clarify questions as to the Fish and Wildlife Service's position by reading the Fish and Wildlife Service letter in full.

■ The Final Environmental Impact Statement/Report's statement about the Monterey Peninsula Water Management District amounts to overstatement and is more troubling on its face. The Final Environmental Impact Statement/Report inaccurately states that the Monterey Peninsula Water Management District will assume long-term maintenance of the wetlands restoration project. 25 SAR 7797. At the time the Environment Impact Statement/Report was written, the Monterey Peninsula Water Management District had not agreed to do so; Caltrans had only conducted informal discussions with the Monterey Peninsula Water Management District as to possible mitigation sites. 27 SAR 8500. The Final Environmental Impact Statement/Report never asserts that a "formal" arrangement had been reached between the parties, although this could be inferred. Nonetheless, the Final Environmental Impact Statement/Report's error is inconsequential because the mitigation plan is not yet final and further details may include a plan with the Monterey Peninsula Water Management District or another responsible agency. We do not condone the "loose" language used in the Final Environmental Impact Statement/Report on this issue, but ultimately this error did not significantly undermine the goals of the National Environmental Policy Act. *See Laguna Greenbelt*, 42 F.3d at 527 ("technical" nondisclosure not fatal to Environmental Impact Statement under National Environmental Policy Act if the decisionmaker "was otherwise fully informed as to the environmental consequences and [National Environmental Policy Act's] goals were met.").

■ Carmel next objects on the grounds that the Final Environmental Impact Statement/Report fails both to credit properly the difficulties involved in the proposed mitigation plan and to describe adequately the plan in sufficient detail to allow for proper evaluation.[8] An Environmental Impact Statement must include a detailed statement regarding adverse environmental effects that cannot be avoided. 42 U.S.C. § 4332(2)(C)(ii). This requirement entails a

---

8. The viability of the mitigation plan set out in the Final Environmental Impact Statement/Report has been severely criticized. The Fish and Wildlife Service, for example, questions the plan's proposal to replace certain "natural" wetlands with "artificial" ones. 27 SAR 8626. The

Environmental Protection Agency commented that the Final Environmental Impact Statement/Report's mitigation plan was "not specific" and thus the agency could not "adequately judge whether the measures described would offset project impacts." 27 SAR 8572–73.

duty to discuss measures to mitigate adverse environmental requirements. 40 C.F.R. § 1502.16(h); *see Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351–52, 109 S.Ct. 1835, 1846–47, 104 L.Ed.2d 351 (1989).[9] Mitigation must "be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.* at 353, 109 S.Ct. at 1847. An Environmental Impact Statement need not contain a "complete mitigation plan" that is "actually formulated and adopted." *Id.* at 352, 109 S.Ct. at 1846; *see Laguna Greenbelt* 42 F.3d at 528 ("[The National Environmental Policy Act] does not require a fully developed plan that will mitigate all environmental harm before an agency can act"). An Environmental Impact Statement cannot, however, omit a reasonably thorough discussion of mitigation measures because to do so would undermine the action-forcing goals of the National Environmental Policy Act. *Id.* at 529.

The Final Environmental Impact Statement/Report here sets forth a detailed mitigation plan, including both on-site and off-site mitigation proposals. As noted the plan seeks to replace removed wetlands on a 1:1 ratio. The Final Environmental Impact Statement/Report proposes, among other things, an "environmentally sensitive area," as well as other specific plans including "[r]eplacement and enhancement of approximately 2.1 acres of riparian wetland" in the existing Hatton Canyon drainage channel, replacement of "approximately 1.2 acres of riparian vegetation" near the existing Carmel River Bridge, and plantation of willows and other riparian vegetation. 25 SAR 7795–97. The proposed mitigation plan is intended to be "conceptual" only; the plan remains flexible to adapt for future problems. Further, the Final Environmental Impact Statement/Report also provides a contingent plan that "will be utilized should all or part of the proposed mitigation fail." 25 SAR 7797. In the face of these details, we cannot say that the Final Environmental Impact Statement/Report's discussion of the mitigation plan is not thorough, despite agency criticisms.

**B. Monterey Pine**

■ Carmel next argues that the Final Environmental Impact Statement/Report fails to properly analyze the project-specific impact on Hatton Canyon's Monterey pine forest. Carmel claims, for example, that the Final Environmental Impact Statement/Report's plan to plant seedlings is insufficient to "fully" mitigate the lost Monterey pines. We disagree.

The Final Environmental Impact Statement/Report describes the impact on the Monterey pine forest in detail. The Final Environmental Impact Statement/Report forecasts the loss of 21 of the 70 acres of Monterey pines in the Hatton Canyon, amounting to an estimated loss of 13,150 out of a total of 57,400 trees. The Final Environmental Impact Statement/Report notes that this impact will be "greatest" at the "head of the Hatton Canyon near Carpenter Street" and is equally forthcoming about the importance of these trees, noting that this forest of Monterey pine is part of the "largest of the three remaining native Monterey pine populations in California." 25 SAR 7788. The Final Environmental Impact Statement/Report also notes the continuing loss of these pines due to urbanization, natural fires, and the "extensive use of Monterey pines of unknown genetic origin in landscaping." 25 SAR 7788.

The Final Environmental Impact Statement/Report's Monterey pine mitigation plan is equally detailed. The Federal Highway Administration and Caltrans propose to replant 20.3 acres with contract-grown Monterey pine seedlings grown from the Hatton Canyon population. The Final Environmental Impact Statement/Report concludes that these replantings "would mitigate the impact to the native Monterey pine forest to a non-significant level through replacement of trees removed with planting of the same genetic stock." 25 SAR 7789.

Carmel fails to undermine the Final Environmental Impact Statement/Report's mitigation plan; *its references to outside criticism alone are not sufficient to invalidate the*

---

9. The National Environmental Policy Act's implementing regulations were formulated by the Council on Environmental Quality and appear at 40 C.F.R. §§ 1500–1508.

Environmental Impact Statement/Report. The Final Environmental Impact Statement/Report's Monterey pine discussion was reasonably thorough. We hold that the Final Environmental Impact Statement/Report's mitigation plan satisfies the National Environmental Policy Act's requirements.

## C. Reasonable Alternatives

Carmel contends that the Final Environmental Impact Statement/Report failed to properly consider several environmentally superior alternatives to the Hatton Canyon proposal. Specifically, Carmel argues that the Federal Highway Administration and Caltrans unjustifiably narrowed its statement of "Purpose and Need" from the Draft Environmental Impact Statement/Report to Final Environmental Impact Statement/Report by including a requirement of Level of Service C. Consequently, Carmel argues, the Federal Highway Administration and Caltrans preordained Alternative 1C Modified as the preferred choice because it was the only alternative which satisfied the Level of Service C goal.

■ An Environmental Impact Statement must discuss "reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); *Alaska Wilderness Recreation v. Morrison*, 67 F.3d 723, 729 (9th Cir.1995); *see* 40 C.F.R. § 1502.14 (consideration of alternatives "is the heart of the environmental impact statement."). The "rule of reason" guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C.Cir.1991) (quoting *State of Alaska v. Andrus*, 580 F.2d 465, 475 (D.C.Cir.1978)). The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones. 40 C.F.R. § 1502.14(a)-(c).[10]

■ Project alternatives derive from an Environmental Impact Statement's "Purpose and Need" section, which briefly defines "the underlying purpose and need to which the

agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The stated goal of a project necessarily dictates the range of "reasonable" alternatives and an agency cannot define its objectives in unreasonably narrow terms. *See Citizens Against Burlington,* 938 F.2d at 196.

We must determine whether the Final Environmental Impact Statement/Report's "Purpose and Need" was reasonable, particularly whether Level of Service C was a reasonable goal, and then whether the alternatives considered were reasonable in light of the cited project goals.

### 1. Purpose and Need

■ The Final Environmental Impact Statement/Report clearly set Level of Service C as a goal, a reasonable goal in light of the traffic difficulties which necessitated this project, and a goal previously considered in the Draft Environmental Impact Statement/Report.

We begin with the Final Environmental Impact Statement/Report's "Purpose and Need" section, which reads:

> The purpose of the project is to relieve current traffic congestion, lessen emergency vehicle response time, reduce crossing conflicts at local intersections and driveways, improve safety, ameliorate air quality, and bring the rural road character back to the local area. Improvement for congestion relief to the area should provide capacity to meet traffic service needs for the next 20 years at Level of Service C in order to be a reasonable expenditure of public funds. Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the existing local street system. Descriptions of the specific project alternatives are provided in Chapter II.

25 SAR 7648.

First, the inclusion of Level of Service C in the Final Environmental Impact Statement/Report is an enhancement from the

---

10. Title 40 C.F.R. § 1502.14(a) requires that an Environmental Impact Statement:

Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives

which were eliminated from the detailed study, briefly discuss the reasons for their having been eliminated.

"Purpose and Need" section of the Draft Environmental Impact Statement/Report, but hardly a surprise. The Draft Environmental Impact Statement/Report's "Purpose and Need" section does not specifically reference Level of Service C, it only comments generally as to traffic flow, noting:

> Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the existing local street system.

11 SAR 3121.[11] Level of Service C is explicitly mentioned in the Draft Environmental Impact Statement/Report's "Problem Definition" section, which notes:

> The capacity of the existing highway has not kept pace with the increased travel demands. The Monterey County Transportation Commission has established [Level of Service C] as the minimum acceptable level of service.

11 SAR 3123.[12] Level of Service C was also discussed in the "Preferred Alternative Recommendation" issued after the Draft Environmental Impact Statement/Report, but before the Final Environmental Impact Statement/Report. 14 SAR 4018. This finding made formal the Level of Service C goal and put all parties on notice. The Smith Report confirms this fact: in that document the Hatton Canyon Coalition's own expert conceded that Level of Service C was a project goal. II FAR 7406, 7471.

■ The Final Environmental Impact Statement/Report's "Purpose and Need" section simply enhanced its description of the project goal. That the Final Environmental Impact Statement/Report was "changed" or altered from its draft version to more clearly articulate its "Purpose and Need" is not inappropriate. To the contrary, the very purpose of a draft and the ensuing comment period is to elicit suggestions and criticisms to enhance the proposed project. *See City of Grapevine, Tex. v. Department of Transp.,* 17 F.3d 1502, 1507 (D.C.Cir.1994).

Second, Level of Service C is not an unreasonable goal; nothing about this selection is either arbitrary or capricious. This project began in response to the severe congestion problems on Highway 1 in the City of Carmel area. A route achieving Level of Service C would significantly alleviate traffic congestion, reduce accidents and achieve other transportation goals. Thus even if not man-

---

11. The Draft Environmental Impact Statement/Report's "Purpose and Need" section reads in full:

> The purpose of the proposed project alternatives is to improve the capacity of Highway 1 and reduce crossing and turning conflicts associated with several local streets and private driveways. Project alternative solutions would provide for improved level of service for through traffic on Highway 1 and improved road connections between Highway 1 and the existing local street system. Descriptions of the specific project alternatives are provided in Chapter II.
> Improvements to Highway 1 are needed to reduce existing congestion on Highway 1 in the Carmel Hill area. The project alternatives would result in the following improvements to varying degrees:
> — The accident rates on the existing Highway 1 would be reduced;
> — Congestion at existing street intersections would be reduced;
> — Travel time would be reduced;
> — Air Quality within the project's area of influence would be slightly improved;
> — There would be improved accessibility and safety for vehicles, bicyclists, and pedestrians from Carmel High School;
> — There would be improved highway capacity to handle existing peak hour and tourist season flows; and

> — Would be more consistent with the Monterey County General Plan.
> 11 SAR 3121.

12. Carmel correctly notes that Monterey County's most recent transportation report, the Monterey County Congestion Management Plan, adopted after the Final Environmental Impact Statement/Report was issued, does not set Level of Service C as a fixed requirement, but rather a goal. The report states, in its "Interim Level of Service (LOS) Standard" section, that:

> This Level of Service Standard is interim, and will be updated as each local jurisdiction adopts a [Level of Service] standard equal to or better than that shown in standards 2, 3, or 4 below. Adoption of [a Level of Service] standard will be part of the conformity finding during the coming year. The intent is to resolve congestion problems and increase the [Level of Service] standard towards the long range policy goal of [Level of Service C] ...
> The objective of [Level of Service C] for the entire network is tempered by the requirement for lead agencies to avoid, where feasible, unacceptable environmental or cost consequences.
> XIII FAR 5732, 5735.

dated, a project attaining Level of Service C is a legitimate goal if balanced against competing factors. Here, the Federal Highway Administration and Caltrans simply refined the "Purpose and Need" section to more clearly state the project goals.

Carmel disagrees and argues that the Final Environmental Impact Statement/Report was unjustified in "elevating" Level of Service C to a project goal because "any improvement" on the current Level of Service would be acceptable under the Draft Environmental Impact Statement/Report, particularly Level of Service D. Carmel cites the Smith Report for support:

> Whereas the maintenance of Level of Service (LOS) C is a desirable objective from the standpoint of traffic service and mobility, and is a current policy objective of some public agencies, such as Monterey County, this threshold is seldom attained in every location in any urban area as large as the Monterey/Carmel/Pacific Grove area. *The attainment of [Level of Service C] is not an inflexible institutionalized mandate. Traffic improvement plans for many highway corridors of this state are not designed to maintain [Level of Service C]; [Level of Service D] is used as an acceptable (tolerable) threshold in many areas.* Caltrans itself has no plans to upgrade certain congested corridors in other areas to [Level of Service C], or even [Level of Service D]. Monterey County is now formally evaluating its [Level of Service] policy as part of the Congestion Management Program; *it is possible that D or E will soon be considered officially acceptable for major arterials and highways.*

II FAR 7484 (emphasis added). These assertions do not condemn the choice of Level of Service C as a goal. That the Federal Highway Administration and Caltrans viewed Level of Service C as important and as the most plausible project goal given the severe traffic problems along this stretch of Highway 1 cannot be said to be unreasonable simply because Level of Service D would have been a "tolerable" alternative.

Third, and perhaps most important, Level of Service C was never the sole defined project goal. Several factors, including environmental and financial concerns, were weighed in the decisional process. The Final Environmental Impact Statement/Report lists a variety of factors considered in the "Selection Analysis:" "traffic capacity, delay, traffic operation, safety, driving time, local and regional planning, public input, environmental impacts and mitigation, and public costs." 25 SAR 7639. These factors derive from the "Purpose and Need" section of the Draft Environmental Impact Statement/Report. 25 SAR 7648. Although these factors tip in favor of traffic concerns as five of the eight factors consider traffic in some regard, other factors were considered, namely the environment and public costs. Nothing in the Final Environmental Impact Statement/Report suggests that Level of Service C was elevated above the environmental and financial considerations listed. We hold that the choice of Level of Service C as a project goal, one of several, was not unreasonable.

2. Alternatives

Having reviewed the project goals, we can now consider the range of alternatives analyzed in the Final Environmental Impact Statement/Report. All of the alternatives considered in the Final Environmental Impact Statement/Report, aside from the "no action" proposal, sought either to expand Highway 1, or to build a new freeway through Hatton Canyon. Alternative 1, with its various modifications, 1A, 1B, 1C, 1C Modified, and 1D, proposed a new freeway through Hatton Canyon. These versions of Alternative 1 differed as to where each rejoined Highway 1 to the south. Alternatives 3, 4 and 6 all proposed to improve the existing Highway 1 in some degree; Alternative 3 proposed to expand Highway 1 to three lanes in a targeted zone; Alternative 4, and Alternative 4 Modified, favored expansion to four lanes; and Alternative 6 proposed a six-lane highway.[13] Alternative 7 contemplated both

**13.** Each of the alternatives proposing enhancements to Highway 1, Alternatives 3,4 and 6, were numbered to reflect the number of lanes in the finished project. Thus Alternative 3 proposed expanding Highway 1 to three lanes; Alternative 4 proposes expanding Highway 1 to four lanes. Alternative 1 deals with the Hatton Canyon proposal and Alternative 7 is a combination of the Hatton Canyon and Highway 1 options. There was no Alternatives 2 or 5.

an enhancement to Highway 1 and a new Hatton Canyon freeway.[14] These alternatives, with a few exceptions, were essentially the same as those outlined in the Draft Environmental Impact Statement/Report. The Draft Environmental Impact Statement/Report had previously considered and rejected several other proposals: (1) the Hatton Loop, (2) a freeway on the existing Highway 1, (3) a down-scoped Hatton Canyon route, (4) a Carmel Valley Road separation, and (5) high occupancy vehicle lanes (HOV). These alternatives were rejected for a variety of reasons including cost and environmental impact.

**14.** The Final Environmental Impact Statement/Report describes the proposed alternatives as follows:

Alternative 1C Modified provides a four-lane divided freeway on a new alignment through Hatton Canyon from Carmel Valley Road to the existing freeway interchange at Carmel Hill (State Route 68/1). A two-lane conventional highway will cross the Carmel River on a new 57–foot wide bridge and transition into the new freeway near Carmel Valley Road. The existing Carmel River Bridge and the roadway between Oliver Road and the southern limits of the new alignment would be removed. A new connection between the existing highway at Oliver Road and the new alignment would be constructed with an at-grade intersection on the new alignment between Rio Road and the Carmel River Bridge. Interchanges on the new freeway will be constructed at Carmel Valley Road and at Carpenter Street. A grade separation will be constructed at Rio Road. Carmel Valley Road will be widened from two to four-lanes between the existing highway and Carmel Ranch Boulevard....

. . .

The estimated cost of the selected alternative [is $33 million].
24 SAR 7660–7662.
Alternative 3 would widen the existing highway to three lanes from Carmel Valley Road to Morse Drive, and improve the existing one lane section from Morse Drive to Ocean Avenue. Left-turn channelization would be provided for all public road connections between Carmel Valley Road and Morse Drive. The existing left-turn pocket from southbound Highway 1 to Carmel Valley Road would be lengthened to provide additional storage.
[Cost is estimated at $3.7 million.]

. . .

Alternative 4 would widen the existing Highway 1 to four lanes from Rio Road to Ocean Avenue. Left-turn channelization would be provided for all public road connections between Carmel Valley Road and Ocean Avenue. The existing left-turn pocket from southbound Highway 1 to Carmel Valley Road would be lengthened to provide additional storage.
[Cost is estimated at $4.5 million.]

. . .

[Alternative 4 Modified] As a result of comments from the public review of the [Draft Environmental Impact Statement] and comments received at the project Public Hearing, a modification of Alternative 4 was developed which included an interchange at Carmel Valley Road.... Four design variations of the interchange were considered:

— Alternative 4–1A would include an interchange which would have both the southbound Highway 1 to eastbound Carmel Valley Road (CVR) movement, and the westbound CVR to southbound Highway 1 movement passing under Highway 1. The two movements would be separated by a traffic signal. The interchange would also provide northbound Highway 1 with on and off ramps.

— Alternative 4–1B does not provide for the westbound CVR to southbound Highway 1 movement at the proposed interchange. The westbound/southbound move would be via Carmel Rancho Blvd. and Rio Road, as is required under present conditions.

— Alternative 4–2A would the be same as Alt 4–1A except that the proposed four lane section of Highway 1 would end at Carmel Valley Road. Between Carmel Valley Road and Rio Road, only two lanes would be provided on highway 1.

— Alternative 4–2B would be the same as Alt 4–1B except that the proposed four lane section of Highway 1 would end at Carmel Valley Road. Between Carmel Valley Road and Rio Road, only two-lanes would be provided on Highway 1.
[Estimated costs range from $5.3 million to $9.4 million.]

. . .

Alternative 6 would widen the existing Highway 1 to four-lanes from Rio Road to Carmel Valley Road. From Carmel Valley Road to Carpenter Street, Highway 1 would be widened to six lanes with a two-way left-turn lane. North of Carpenter Street, the right lane in each direction would become the exit and entrance ramps to/from the Route 68 (west)/Highway 1 interchange. The remaining four through lanes would conform to the existing Highway 1 freeway to Monterey.
[Estimated cost is $11.2 million.]

. . .

Alternative 7 would place Highway 1 on a new alignment through Hatton Canyon (Alternative 1) and widen the existing Highway 1 northbound roadway to three lanes from Carmel Valley Road to Ocean Avenue (Alternative 3).
[Estimated cost is $33–34 million.]
24 SAR 7677–7700. This range of alternatives is essentially similar to the alternatives outlined in the Draft Environmental Impact Statement/Report.

Carmel's claim that Alternative 1C Modified was the only alternative that met the project goals is unfounded. Each of the alternatives considered in the Final Environmental Impact Statement/Report achieved the project goals, from traffic delay to safety to environmental impact, in varying degrees. No one alternative fulfilled all the goals completely. For example, Alternative 7 likely best satisfied the traffic goals, but it was costly and failed to conform to local planning specifications. Alternatives 3, 4 and 6 each had advantages from an environmental and traffic standpoint, although none were consistent with local planning and none reached the Level of Service C goal. Alternative 1C Modified meet the traffic goals, but was arguably less attractive from an environmental standpoint—even though these concerns were assuaged by the mitigation plans adopted. These proposals span the spectrum of "reasonable" alternatives and satisfied the requirements of the National Environmental Policy Act. *See Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215 ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device thought and conceivable by the mind of man."). Further, even if Carmel is correct in arguing that Level of Service C was the overriding project goal, Alternative 1C Modified was not the only alternative which satisfied that goal. Alternative 7 also met the Level of Service C goal.

Alternative 1C Modified emerged as a favorite in large part, but not solely, because it met the requisite traffic goal. The Federal Highway Administration and Caltrans justified their selection of Alternative 1C Modified on the grounds that it would provide good service for up to twenty years as well as "prevent excessive traffic delays" and reduce traffic accidents, and thus save more lives than any other proposal. 25 SAR 7666. Further, only Alternative 1C Modified met the "goals" of the California Coastal Act and the Monterey County Local Coastal Plan. 25 SAR 7667.

 In choosing Alternative 1C Modified, the Federal Highway Administration and Caltrans properly rejected the Smith Report recommendation. The Smith Report analyzed the following three proposals: (1) widening Highway 1 with interchanges at Carmel Valley Road and Carpenter Street; (2) a three-lane road through Hatton Canyon; and (3) a four-lane highway through Hatton Canyon. The report endorsed widening Highway 1, characterizing this proposal as less costly than and environmentally superior to Alternative 1C Modified. The Federal Highway Administration and Caltrans properly concluded, in a separate report, against including this recommendation among the alternatives in the Final Environmental Impact Statement/Report on the grounds that it offered "no new, substantive proposal for alternative alignment that has not been previously considered and addressed in the [Environmental Impact Statement]." FR 57. The Smith Report's alternative was similar to Alternative 4 Modified discussed in the Final Environmental Impact Statement/Report and thus did not merit either an independent analysis or inclusion in the Final Environmental Impact Statement/Report. *See Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215. Moreover, the Federal Highway Administration and Caltrans concluded that the Smith Report alternative would only achieve Level of Service F. FR 53–54. The other alternatives considered in the Smith Report, both down-scoped Hatton Canyon alternatives, were previously considered by the Federal Highway Administration and rejected. Both down-scoped projects entailed similar financing and environmental costs as Alternative 1C Modified although attaining less traffic capacity.

Ultimately, Carmel's disagreement with the Final Environmental Impact Statement/Report choice of Alternative 1C Modified appears to be a substantive one: Carmel prefers modifications to Highway 1 over the Hatton Canyon project. Although the merit of their environmental concerns may be strong, these concerns are beyond the scope of our review. *See Robertson,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by [the National Environmental Policy Act] from deciding that other values outweigh the environmental costs."). We reject Carmel's reasonable alternatives challenge.

## D. Cumulative Impacts

 Carmel next argues that the Final Environmental Impact Statement/Report fails to adequately discuss the cumulative impacts of the proposed Hatton Canyon project on the wetlands, Monterey pine and Hickman's onion. The duty to discuss cumulative impacts in an Environmental Impact Statement is mandatory. *See* 40 C.F.R. § 1502.16. The controlling regulation defines "cumulative impact" as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

The Final Environmental Impact Statement/Report fails both to catalogue adequately past projects in the area, and to provide any useful analysis of the cumulative impact of past, present and future projects and the Hatton Canyon freeway on the wetlands, Monterey pine and Hickman's onion. The Final Environmental Impact Statement/Report considers the impact on these resources in individual sections dealing with each resource, and collectively in a section entitled "Environmental Consequences: Cumulative Impacts." These analyses are not lengthy, and taken either separately or together they fail to provide sufficient information to satisfy the National Environmental Policy Act.

To begin, the Final Environmental Impact Statement/Report describes past projects in the area with generalities insufficient to permit adequate review of their cumulative impact. *See Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C.Cir. 1988) ("These perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts."). The Final Environmental Impact

Statement/Report refers generally to the "development projects" and Carmel's "ongoing urbanization." 25 SAR 7886. These descriptions are particularly inadequate in light of the Final Environmental Impact Statement/Report's acknowledgment that the Carmel area has experienced "substantial growth" over "the last 30 years," including development on "both sides of the Hatton Canyon." 11 SAR 3124.

The Final Environmental Impact Statement/Report deals more proficiently with planned future projects, although its reference to the "Growth Inducement" analysis is not particularly helpful as to specifics. The "Cumulative Impacts" section forecasts future development as "primarily residential and commercial," including transportation improvements. The Final Environmental Impact Statement/Report specifically details these projects. 25 SAR 7886 (listing the following proposed development projects: Rancho Odello subdivision, Rancho Canada Lodge, San Carlos Ranch, Carmel Meadows subdivision, Mission Ranch, El Sur Ranch, Carmel River Inn and Point Lobos projects).[15] Missing, however, is any discussion of how these projects together with the proposed Hatton Canyon project will affect the wetlands, Monterey pine and Hickman's onion. *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir.1990) ("[the National Environmental Policy Act] requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an [Environmental Impact Statement]."); *see, e.g., Marsh*, 52 F.3d at 1489 (holding Environmental Impact Statement for dam project insufficient because it did not properly consider the cumulative effects of that project and two existing dam projects on the fish population); *Thomas v. Peterson*, 753 F.2d 754, 755 (9th Cir.1985) (remanding for cumulative impact analysis of timber sales and road construction).

The Final Environmental Impact Statement/Report's individual discussions of the wetlands, Monterey pine and Hickman's on-

**15.** The Final Environmental Impact Statement/Report also lists the following transportation projects: the extension of Rio Road past Carmel Rancho to connect into Carmel Valley Road, and the widening of Carmel Valley Road to four lanes from Via Petra to Robinson Canyon Road. 25 SAR 7886.

ion provide no further meaningful analysis of the cumulative impacts. Both the Monterey pine and the Hickman's onion sections do note the relative importance and availability of these resources in the region. The Final Environmental Impact Statement/Report highlights, for example, the limited areas in California where Hickman's onion is found and specifies the expected damage to this species from the Hatton Canyon freeway proposal. As to cumulative impacts, however, the Final Environmental Impact Statement/Report only notes "threats" to the Hickman Onion from other "development pressures." 25 SAR 7790.[16]

■ The Federal Highway Administration and Caltrans argue throughout that their cumulative impact discussion, however brief, passes muster in the absence of a direct challenge by the plaintiffs to a specific action that the Final Environmental Impact Statement/Report fails to consider. That is, the Federal Highway Administration and Caltrans contend that Carmel fails to meet its burden of proof to show what other projects the Final Environmental Impact Statement/Report failed to consider. But the Federal Highway Administration and Caltrans failed first; they did not properly describe other area projects or detail the cumulative impacts of these projects. The Federal Highway Administration and Caltrans bear this burden under the National Environmental Policy Act. *See City of Davis,* 521 F.2d at 671 ("Compliance with [the National Environmental Policy Act] is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs.")

The Federal Highway Administration and Caltrans cite to, and rely on, the Carmel Valley Master Plan Environmental Impact Report to provide the missing cumulative impacts analysis. We are suspicious as to whether this document alone can supply the necessary analysis because the Final Environmental Impact Statement/Report lacks not only a description of the impacts of past, present and future development on the wetlands, Monterey pine and Hickman's onion, it also lacks an analysis of the cumulative impact of these projects *and* the Hatton Canyon freeway on the wetlands, Monterey pine and Hickman's onion. The Carmel Valley Master Plan Environmental Impact Report may assume, however, like other regional planning documents, that the Hatton Canyon highway would be completed; we cannot answer this question as it is not clear that the Carmel Valley Master Plan Environmental Impact Report was properly included in the record. Further it is not clear that the agencies properly incorporated the Carmel Valley Master Plan Environmental Impact Report into the Final Environmental Impact Statement/Report.[17]

We remand for entry of an order directing the Federal Highway Administration and Caltrans to determine whether the Carmel Valley Master Plan Environmental Impact Report was properly included in the record, properly incorporated and whether it provides the necessary cumulative impacts analysis. To the extent the agencies determine that this information must be supplemented, they must also consider the effect of any additions on the remainder of the Environmental Impact Statement/Report.

16. As to the Monterey pine section, the Final Environmental Impact Statement/Report reports:

The native Monterey pine forest in Hatton Canyon is part of the largest of the three remaining native Monterey pine populations in California. The Monterey population is rapidly being reduced in size and integrity by the urbanization of the area. The extensive removal of native Monterey pines without replacing them, suppression of natural fires, and the extensive use of Monterey pines of unknown genetic origin in landscaping have all contributed to the loss of the native populations. The introduction of Monterey pines of unknown genetic origin has the potential of producing mixed populations that are more vulnerable to insect attacks, dis-

ease and environmental stress than are the native populations.

The special circumstances surrounding the remaining native stands of Monterey pine has led to their placement on the California Native Plant Society's Inventory of Rare and Endangered Vascular Plant (1988) as a species of limited distribution. The impact on the native Monterey pine forest is considered significant. 25 SAR 7788–89.

17. Several documents were included in the record with Plaintiff's March 19, 1993 request for Judicial Notice, including the Carmel Valley Master Plan. The Carmel Valley Master Plan Environmental Impact Report was not among the documents included with this request.

E. Growth–Inducing Impacts

 Carmel next contends that the Final Environmental Impact Statement/Report fails to consider adequately the Hatton Canyon freeway's growth-inducing effects as required by the National Environmental Policy Act. Carmel argues, citing *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir.1975), that construction of the Hatton Canyon freeway would necessarily induce growth, and that the Environmental Impact Statement/Report therefore must evaluate the range and scope of this potential development.

Title 40 C.F.R. § 1502.16 requires an Environmental Impact Statement to consider both direct and indirect effects and the regulations define "effects" as including:

> growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. 1508.8(b). Consideration of the growth-inducing effects furthers the National Environmental Policy Act's information and public awareness goals. In *City of Davis*, we held that the defendant agencies failed to properly consider the growth-inducing impacts of a proposed freeway, the very intent of which was to promote future development. 521 F.2d at 675–77 ("The growth-inducing effects of the [proposed] project are its raison d'etre. . . ."). The project site in *City of Davis* was a sparsely populated agricultural area, yet neither the state nor federal agencies involved prepared an Environmental Impact Statement or Report, having concluded that the interchange would have no significant effect on the surrounding environment. *Id.* at 667.

The Federal Highway Administration and Caltrans did consider the growth-inducing impact of the Hatton Canyon proposal here, and although their analysis is not without fault, it satisfies the National Environmental Policy Act. The Final Environmental Impact Statement/Report notes that the Hatton Canyon project "had the potential to facilitate growth" but would not ultimately do so because of the development constraints imposed by local authorities. *See* 25 SAR 7880. The Final Environmental Impact Statement/Report also states that any impacts

associated with the Hatton Canyon proposal were addressed in Environmental Impact Reports prepared for the Greater Monterey Peninsula Area Plan and the Carmel Valley Master Plan, concluding: "Alternative 1 does not have the potential for growth beyond that identified in the local plans." 25 SAR 7880.

Unlike the locale at issue in *City of Davis*, Carmel is a well developed area, and, although the Hatton Canyon freeway may induce limited additional development, it is the existing development that necessitates the freeway. *See, e.g.,* 25 SAR 7879 ("very little opportunity for development would occur within the highway corridor."). The construction of the Hatton Canyon freeway will not spur on any unintended or, more importantly, unaccounted for, development because local officials have already planned for the future use of the land, under the assumption that the Hatton Canyon Freeway would be completed. 25 SAR 7799–80. Although the relevant information is segmented here, as the Final Environmental Impact Statement/Report relies on both the Carmel Valley Master Plan and the Greater Monterey Peninsula Area Plan, the requisite analysis is provided. *See Laguna Greenbelt,* 42 F.3d at 524 n. 6 (use of state environmental documents appropriate given National Environmental Policy Act's mandate requiring state and federal cooperation) (citing 40 C.F.R. § 1506.2(b)).

Carmel notes that certain development is planned in the Hatton Canyon area that is contingent on the completion of the proposed freeway: development that would be "induced" by the freeway. In *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d at 524, we allowed agencies to rely on local planning documents in its Environmental Impact Statement to established that a proposed highway would not result in further growth because the surrounding land at issue was already developed or was otherwise committed to uses that were not contingent on the highway construction. Here, however, the Final Environmental Impact Statement/Report admits that development may result from the freeway project. This development is nonetheless planned for in the

Carmel Valley Master Plan; it has been accounted for and properly analyzed. 25 SAR 7880. No further analysis is warranted. *See Laguna Greenbelt,* 42 F.3d at 526 n. 6 (the absence of a more thorough discussion in an Environmental Impact Statement of an issue that was sufficiently analyzed in referenced state materials does not violate the National Environmental Policy Act).

IV

 Next, we turn to Carmel's California Environmental Quality Act challenges. As noted, the California Environmental Quality Act sets procedural requirements similar to the National Environmental Policy Act. *Friends of Mammoth v. Board of Sup'rs of Mono County,* 8 Cal.3d 247, 104 Cal.Rptr. 761, 502 P.2d 1049, 1057 (1972). An Environment Impact Report, like an Environmental Impact Statement, seeks "to inform the public and its responsible officials of the environmental consequences of their decisions before they are made." *Citizens of Goleta Valley,* 276 Cal.Rptr. 410, 801 P.2d at 1167.

 We review an Environmental Impact Report under Cal.Pub.Res.Code § 21168.5, which establishes the standard of review for agency action under the California Environmental Quality Act as:

whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.

*See League for Protection of Oakland's Architectural and Historic Resources v. City of Oakland,* 52 Cal.App.4th 896, 60 Cal.Rptr.2d 821, 826 (1997). An agency fails to proceed "in a manner required by law" when its Environmental Impact Report omits relevant information and thus precludes informed decisionmaking and public participation. *See Kings County Farm Bureau v. City of Hanford,* 221 Cal.App.3d 692, 270 Cal.Rptr. 650, 657 (1990).

 We set out with care the controlling standards under the California Environmental Quality Act here, and although differences result from a direct comparison of the statutory language between the National Environmental Policy Act and California Envi-

ronmental Quality Act, the two statutes are similar in application here. Although the California Environmental Quality Act imposes substantive requirements, we, as a reviewing court, will not "pass upon the correctness of the Environmental Impact Report's environmental conclusions, but only upon its sufficiency as an informative document." *County of Inyo v. City of Los Angeles,* 71 Cal. App.3d 185, 139 Cal.Rptr. 396, 399 (1977); *see Rural Landowners Assn. v. City Council,* 143 Cal.App.3d 1013, 192 Cal.Rptr. 325, 329 (1983) ("The final decision on the merits of a project is the responsibility of the lead agency.").

Given our analysis under the National Environmental Policy Act, our discussion here is brief.

A. Wetlands

 Carmel attacks the Final Environmental Impact Statement/Report wetlands description and mitigation plan as inadequate under the California Environmental Quality Act. The California Environmental Quality Act requires that an Environmental Impact Report:

identify the significant effects on the environment of a project, [ ] identify alternatives to the project, and [ ] indicate the manner in which those significant effects can be mitigated or avoided.

Cal.Pub.Res.Code § 21002.1(a). The controlling regulation defines a "significant effect on the environment" as a "substantial, or potentially substantially, adverse change in the environment." Cal.Pub.Res.Code § 21068. The Final Environmental Impact Statement/Report classifies the Hatton Canyon's impact on the wetlands as "significant," 25 SAR 7791, and thus presents a detailed discussion as to the area in question and plans to mitigate. The Final Environmental Impact Statement/Report, for example, unequivocally states that certain wetlands will be permanently destroyed. We hold that this discussion suffices under the California Environmental Quality Act. *See Kings County Farm,* 270 Cal.Rptr. at 656 (The "[California Environmental Quality Act] requires an [Environmental Impact Report] to reflect a good faith effort at full disclosure; it does

not mandate perfection, nor does it require an analysis to be exhaustive.") (citing 14 C.C.R. § 15151).

■■■■ The Final Environmental Impact Statement/Report's mitigation plan is also sufficient under the California Environmental Quality Act. Mitigation plays a heightened role under the California Environmental Quality Act; once an environmental impact has been declared to be "significant," as here, the agency is required to find that sufficient mitigation measures have been taken to lessen the project's impact. If the agency finds that alternatives or mitigation measures are not feasible, the agency must adopt a statement of overriding considerations which states the specific reasons why "the project's benefit outweighs the unmitigated effects." *See id.* (citing Cal.Pub.Res. Code, §§ 21002, 21002.1, 21081; 14 C.C.R. §§ 15091–15093).[18] The Federal Highway Administration and Caltrans proposed a detailed mitigation plan to compensate for the loss of wetlands. The proposed plan includes a replacement ratio of greater than 1:1, including both on-site and off-site mitigation. 25 SAR 7795–97. This presentation is sufficient to satisfy the California Environmental Quality Act. Agency criticism of these plans, standing alone, does not invalidate the Final Environmental Impact Statement/Report in the face of this thorough discussion of the wetlands and wetlands mitigation plan. *See Laurel Heights Imp. Ass'n of San Francisco, Inc. v. Regents of University of California,* 47 Cal.3d 376, 253 Cal.Rptr. 426, 764 P.2d 278, 294 (1988) ("It is also well established that '[d]isagreement among experts does not make an EIR inadequate.'") (quoting *Karlson v. City of Camarillo,* 100 Cal.App.3d 789, 161 Cal.Rptr. 260, 269 (1980)). We reject Carmel's challenge.

### B. Monterey Pine

■■■■ Carmel attacks the Final Environmental Impact Statement/Report's Monterey pine mitigation plan as insufficient under the California Environmental Quality Act. As discussed above in Section IIIB, supra, the Final Environmental Impact Statement/Report details the area in question as well as the

environmental consequences of the proposed freeway. The Final Environmental Impact Statement/Report characterizes the impact as "significant," 25 SAR 7789, and sets forth a mitigation plan for replanting seedlings with adequate protection to ensure the survival of these pines, 25 SAR 7788–89. We hold this mitigation plan suffices under the California Environmental Quality Act.

### C. Reasonable Alternatives

■■■■ Carmel next attacks the Final Environmental Impact Statement/Report's alternatives proposals as unreasonable. Carmel asserts two arguments: (1) that the elevation of Level of Service C to a project goal was unreasonable, and (2) that the range of alternatives considered in light of this goal was unreasonable.

■■■■ The California Environmental Quality Act mandates consideration of alternatives in the Environmental Impact Report. *See* Cal.Pub.Res.Code §§ 21001, 21002.1, 21061, 21100; 14 C.C.R. § 15126(d); *Laurel Heights,* 253 Cal.Rptr. 426, 764 P.2d at 288 (The "[California Environmental Quality Act] and the Guidelines are replete with references to the need for a discussion of project alternatives."). The range of alternatives meriting consideration is guided by the doctrine of "feasibility," *Citizens of Goleta Valley,* 276 Cal.Rptr. 410, 801 P.2d at 1167, which is defined by statute as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors," Cal.Pub.Res.Code, § 21061.1; *see Laurel Heights,* 253 Cal.Rptr. 426, 764 P.2d at 288. An Environmental Impact Report must "[d]escribe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." 14 C.C.R. § 15126(d). California courts consider the statutory requirements for alternatives under the "rule

---

18. The California Environmental Quality Act is implemented through a variety of "guidelines" which are published at 14 C.C.R. § 15000, *et seq.*

of reason." *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco,* 106 Cal.App.3d 893, 165 Cal. Rptr. 401, 411 (1980).

The Final Environmental Impact Statement/Report meets the requirements of the California Environmental Quality Act. We rely on our discussion in Section IIIC, supra. Level of Service C was a feasible project goal; its adoption as a project goal was reasonable given the congestion problems on Highway 1 as well as the "goals" of the local agencies. Further, Level of Service C was only one of several project goals. The alternatives considered each meet the project goals in varying degrees; at least one other alternative met the Level of Service C goal. Given the traffic, environmental and financial goals of the project, Alternative 1C Modified was a reasonable choice. The Final Environmental Impact Statement/Report's discussion of alternatives was "meaningful" and contained "analysis sufficient to allow informed decision making." *Laurel Heights,* 253 Cal. Rptr. 426, 764 P.2d at 291.

D. Cumulative Impacts

■■■ The California Environmental Quality Act's cumulative impacts requirements closely mirror the federal standards, and thus the Final Environmental Impact Statement/Report is inadequate here as under the National Environmental Policy Act. *See* 14 C.C.R. § 15355.[19] As in *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus,* 27 Cal.App.4th 713, 32 Cal.Rptr.2d 704 (1994), the Final Environmental Impact Statement/Report here fails to specifically list other relevant projects in the region, *id.* at 720, which precludes an analysis of the cumulative impact of those projects and the Hatton Canyon freeway. The Monterey Valley Master Plan, cited in the Final Environmental Impact Statement/Report may address these concerns. As before, we remand to the district court for a determination of

this issue by the Federal Highway Administration and Caltrans.

E. Growth–Inducing Effects

■■■ Carmel attacks the Final Environmental Impact Statement/Report's growth-inducing analysis as inadequate. The California Environmental Quality Act's growth-inducing effects requirements differ from the federal standard. The California Environmental Quality Act requires a discussion of various considerations, including factors that could "foster economic or population growth," remove obstacles to population growth, or "further tax existing community services." *See* 14 C.C.R. § 15126(f). The California Environmental Quality Act also requires discussion of "other activities that could significantly affect the environment, either individually or cumulatively." *Id.*

The Final Environmental Impact Statement/Report's discussion of growth-inducing effects here is fairly extensive. Although the Final Environmental Impact Statement/Report does not discuss the potential for economic or population growth, it does reference several local planning documents, including the Carmel Valley Master Plan and the Monterey Peninsula Area Plan which specifically include construction of the Hatton Canyon freeway in their growth plans, and discuss overall growth targets and limits. This information is adequate to satisfy the California Environmental Quality Act's requirements.

V

■■■ Carmel argues that the Federal Highway Administration erred in finding that the Hatton Canyon project satisfied the requirements of Executive Orders 11988, 42 Fed.Reg. 26951 (1977), and 11990, 42 Fed. Reg. 26961 (1977). These Executive Orders direct federal agencies to minimize the ad-

**19.** Title 14 C.C.R. § 15355 states:

'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

(a) The individual effects may be changes resulting from a single project or a number of separate projects.

(b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.

verse effect of federal actions on floodplains and wetlands. *Id.*

As a threshold matter we consider whether these Executive Orders are subject to judicial review. We previously assumed, without analysis, that Executive Orders 11988 and 11990 were subject to judicial review. *National Wildlife Federation v. Adams,* 629 F.2d 587, 592–93 (9th Cir.1980); *see Daingerfield Island Protective Soc. v. Babbitt,* 40 F.3d 442, 447 (D.C.Cir.1994). Neither Executive Order explicitly creates a cause of action or mentions judicial review. We have recognized, however, that under certain circumstances, ·Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act. *See Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 903 (9th Cir.1983); *see, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 317–19, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979) (under the Administrative Procedure Act it is not necessary to find a private right of action under a particular statute in order to enforce a federal agency's compliance with that statute). The Executive Orders here do not preclude judicial review and there is "law to apply," as these Executive Orders set objective standards. We hold that both Executive Orders 11988 and 11990 are subject to judicial review under the Administrative Procedure Act.

■■■■ An agency's findings under an Executive Order will be set aside only if they are "arbitrary, capricious, [or] an abuse of discretion" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *National Wildlife,* 629 F.2d at 592 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). We consider whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Our inquiry is to be "searching and careful," but our review remains narrow: we will not substitute our judgment for that of the Federal Highway Administration. *Id.*

## A. Executive Order 11988

■■■■ Executive Order 11988, entitled "Floodplain Management," requires federal agencies taking action "in or affecting a floodplain" to think twice. The agency must consider the project's effects on the floodplains and possible alternatives, and may proceed only if it finds that the "only practicable alternative" requires "sitting in" the floodplain.[20] In designing its plan the agency must take steps to minimize potential damage to the floodplain. 42 Fed.Reg. 26951 (1977).

The Federal Highway Administration issued a "Floodplain Only Practicable Alternative Finding," which found Alternative 1C Modified to be the "only practicable alternative." 25 SAR 7985–86. The report discussed and rejected Alternatives 3, 4 and 6 because each failed to meet either "Monterey County's long-range planning and transportation goals," or the "identified transportation need." 25 SAR 7985–86.[21]

Carmel argues that because no federal, state or local law requires the proposed roadway to attain Level of Service C, the adoption of this goal unnecessarily narrowed the range of alternatives considered. This challenge mirrors Carmel's previous attack on the use of Level of Service C as a goal and the range of alternatives subsequently considered. We again reject Carmel's argument. As noted in Section IIIC, supra, the Federal Highway Administration did not act unreasonably in setting Level of Service C as a goal; Level of Service C was merely one of several project goals considered and the Final Environmental Impact Statement/Report considered a range of alternatives, not all of which satisfied the Level of Service C goal, and at least two of which did. The alternatives considered were reasonable and the Federal Highway Administration's findings

---

**20.** The Federal Highway Administration implementing regulations define "practicable" as "capable of being done within reasonable natural, social, or economic constraints." *See* 23 C.F.R. § 650.105(k) (implementing Executive Order 11988).

**21.** The "Floodplain Only Practicable Alternative Finding" did not address Alternative 7 explicitly, although the wetlands effect from that proposal could be readily ascertained by combining the effects noted for Alternatives 1 and 3.

under Executive Order 11988 were neither arbitrary nor capricious.

### B. Executive Order 11990

 Executive Order 11990 requires a "no practicable alternative" finding. Federal agencies who cannot avoid new construction in wetlands must: (1) make a finding that "no practicable alternative" to construction exists, and (2) include "all practicable measures to minimize harm to wetlands which may result from such use." 42 Fed.Reg. 26961 (1977). An agency may consider economic, environmental and "other pertinent factors" in making these findings. *Id.*

Carmel's objection to Federal Highway Administration's Executive Order 11990 finding is also a familiar one: Carmel again attacks the Final Environmental Impact Statement/Report's wetlands mitigation plan. Carmel argues that the mitigation plan fails to take "all practicable measures to minimize harm to wetlands which may result from such use," as required. We previously held that the Federal Highway Administration's "proposed" mitigation plan satisfied the National Environmental Policy Act because it was "reasonably thorough" in its discussion.

Executive Order 11990 sets forth a more exacting standard than the National Environmental Policy Act. *See National Wildlife,* 629 F.2d at 591 ("We have no doubt that Executive Order 11990 extends a broader protective aura to wetlands than would [the National Environmental Policy Act] standing alone."). The Federal Highway Administration's mitigation discussion in its "only practicable alternative" memorandum although not lengthy, is adequately detailed to meet this standard even though it is not yet final.[22]

The mitigation plan remains only "conceptual," subject to the necessary modifications. Although Executive Order 11990 imposes a continuing duty for the Federal Highway Administration to continue to take "all practicable measures to minimize harm to the wetlands," the Federal Highway Administration has complied to date.

## VI

 Carmel moves for attorney's fees under both state and federal law. The Equal Access to Justice Act, 28 U.S.C. § 2412(d), provides that in a civil action brought by or against the United States, the prevailing party may be awarded costs and attorney's fees, provided the court finds that the position of the United States was not substantially justified and that there are no special circumstances that would make an award unjust. 28 U.S.C. § 2412(d)(1)(A). To be a "prevailing party" under the Equal Access to Justice Act, a party need not prevail on all issues. *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475, 1481 (9th Cir.1983).

The California attorney's fee statute, Cal. Civ.P.Code § 1021.5, provides that a court may award attorney's fees to a "successful party" in an action that:

has resulted in the enforcement of an important right affecting the public interest if: a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, the necessity and financial burden of private enforcement make the award appropriate, and such fees should not in the

---

**22.** Federal Highway Administration's "Measures To Minimize Harm" discussion stated the following:

The proposed project includes compensation for the loss of approximately 11.95 acres of riparian wetlands which will be permanently displaced. A Conceptual Wetland Mitigation Plan has been developed, with consultation and coordination from the U.S. Fish and Wildlife Service. The proposed mitigation would include restoration of the 11.95 acres impacted, at a minimum ratio of 1:1. Approximately 2 1/2 acres would be restored within the project area in Hatton Canyon, 1 acre would be restored at the location of the existing bridge,

and the remainder restored on the Carmel River upstream from the project area. The offsite mitigation would be part of an effort by the Monterey Peninsula Water Management District to reestablish the historic riparian woodland that once bordered Carmel River. Planned work includes the planting and maintenance of riparian woodland and associated understory species. The entire restoration site would be monitored for a period of five years to ensure the success of the restoration. The U.S. Fish and Wildlife Service concurred with the Conceptual Wetland Mitigation Plan in June, 1988 (See Exhibit N).

25 SAR 7984.

interest of justice be paid out of any recovery.

*Hull v. Rossi,* 13 Cal.App.4th 1763, 17 Cal. Rptr.2d 457, 460 (1993) (citing Cal.Civ. P.Code § 1021.5).

The only issue giving Carmel a potential entitlement to a fee award is the cumulative impacts issue. We grant leave to the district court to determine whether attorney's fees are appropriate on this issue and if so, to fix the amount of the award.

## VII

The district court aptly described the Final Environmental Impact Statement/Report as "not perfect." At most times, however, the Final Environmental Impact Statement/Report is sufficiently thorough in its discussions to satisfy both the National Environmental Policy Act and California Environmental Quality Act.

We AFFIRM on all claims except the cumulative impacts issue; we REVERSE and REMAND on that issue. We also affirm the Federal Highway Administration's Executive Order findings.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

TROTT, Circuit Judge, Concurring and Dissenting.

Then I witnessed the torture of Sisyphus, as he wrestled with a huge rock with both hands. Bracing himself and thrusting with hands and feet he pushed the boulder uphill to the top. But every time, as he was about to send it toppling over the crest, its sheer weight turned it back, and once again towards the plain the pitiless rock rolled down. So once more he had to wrestle with the thing and push it up, while the sweat poured from his limbs and the dust rose high above his head.

Homer, The Odyssey (E.V. Rieu & D.C.H. Rieu trans., Penguin Classics 1991).

## I

## THE PROJECT GOAL AND ITS ALTERNATIVES

This project began in 1947 when California's Department of Transportation recognized a serious traffic congestion problem along Highway 1. In 1953, the Department formally designated the affected area as a "freeway" which permitted it to be rebuilt as such. This designation raised a storm of protest, however, and was formally opposed by the City of Carmel. The controversy generated by the idea of a freeway close to the City of Carmel caused the Department to look for alternatives, and the Hatton Canyon Freeway alternative thus surfaced in a Traffic Report in September of 1953. This alternative was formally supported by Carmel in a 1954 resolution which says, "NOW, THEREFORE, BE IT RESOLVED that the City Council reaffirms the feeling expressed in Resolution No. 1373 opposing the location of a freeway along Highway # 1, and strongly urges that every possible consideration be given to the Hatton Canyon Route as much more desirable." It is fair to say that from that time until the present, over 40 years, this issue in great detail has been under almost constant consideration by everyone with an interest in it.

In February, 1957, Monterey County formally entered into a Freeway Agreement with the State Department of Transportation embracing the Hatton Canyon alternative. The Department and others then devoted considerable attention to the effect of the project on the Monterey pine. Numerous alternatives were proposed to accommodate this distinctive ecological interest.

During the 60's and 70's the project plodded along, sometimes forward, sometimes backward as various concerns raised by the project were batted back and forth by interested individuals and groups. At times the City of Carmel was for, and then against, the Hatton Canyon alternative-depending on the interests with the upper political hand in city government.

In 1978, the project seems to have gone dormant for a lack of money at the state level, and it went on the back burner. In 1982, the Department tentatively decided to scrap the Hatton Canyon freeway, among other reasons because of the controversy it had generated. However, the plan to rescind the freeway was greeted with considerable opposition, notably from Carmel, the City of Monterey, the Monterey County Transportation Commission, and the Sierra Club. The

Sierra Club went on record with this statement: "We urge the California Transportation Commission *not* to abandon its Hatton Canyon right of way. We further urge that CalTrans reject any proposals to widen the present Highway 1 between Rio Road and Ocean Avenue. Such widening would represent a 'Band–Aid' approach to congestion problems which have reached crisis dimensions in the last 10 years." Everyone interested continued to acknowledge the problem, but a consensus solution remained elusive.

The Department held a hearing on the proposed rescission. Speaking against it and in favor of the Hatton Canyon freeway was the City of Carmel. Carmel won, and the Department included the project in its 1983 Improvement Program, for construction in 1988.

What followed is quite significant. Both the Department and the Federal Highway Administration commenced wide-scoped initiatives to present this project to the public through informational meetings and to secure local input. Citizens advisory groups cropped-up, and the Department engaged in numerous studies for two years in preparation for a Draft EIS/R. The subjects of these impact studies and inquiries included Monterey pines, wetlands, plant species too numerous to list, geological hazards, endangered species, wildlife, vegetation, seismic hazards, traffic analysis, noise, historic property, archeology, visual impacts and aesthetics, and hydrology. Various alternatives were considered and rejected along the way to the Draft EIS/R, including widening Highway 1 and attacking the problem with a different building configuration known as the Hatton or Carmel Loop. In fact, the project was *awash* in alternative proposals.

Out of all of these extensive studies, investigations, contributions, and proposals of alternatives from the interested parties came the Draft EIS/R in 1986. It was filed with the State Clearinghouse and noted in the Federal Register. The Department then held an extensive public hearing on the draft, and *every public entity involved declared itself as supporting the Hatton Canyon alignment.*

Eight months later, on June 22, 1987, after consideration of the massive input it had received, the Department took a step that is critical in analyzing the appellants' ambush claim: the Department issued an interim report indicating its Preferred Alternative recommendation for the project, Alternate 1C. In this comprehensive document, prepared after a public hearing in Carmel on December 11, 1986, the Department specifically identified LOS C as the project goal:

I. *Alternatives*

 A. Selected Alternate

Alternate 1C is selected for construction. It is the only practical plan that provides acceptable traffic service through the project area for a reasonable period of time. . . .

 B. Other Alternates

 1. [No build].

 2. Alternate 3. [Add a lane to Highway 1].

 3. Alternate 4. [With four variations] [Widen the existing two-lane conventional highway to four lanes].

 4. Alternate 6. [Widen the existing two and four-lane conventional highways to six lanes].

 5. Alternate 7. [Combine Alternates 1 and 7].

II. *Transportation Problem*

 A. Criteria

Level of Service is a qualitative measure used to evaluate traffic operational conditions. . . .

*The Monterey County Transportation Commission established Level of Service C as the minimum acceptable for roads within Monterey County.*

*The American Association of State Highway and Transportation Officials released "A Policy on Geometric Design of Highways and Streets" in 1984. That policy notes that Level of Service C is appropriate for the proposed new freeway or for maintaining the existing arterial highway.* A minimum Level of Service D is appropriate for the existing highway if it becomes a Collector Street (when through traffic is on new freeway).

A period of 20 years has been used as the basis for traffic analysis and project design. Traffic for that period can be estimated with reasonable accuracy. Radical changes in land use or traffic patterns are not expected.

Note: Future traffic volumes would exceed highway capacity by unrealistic amounts with "no build" or Alternate 3. Analysis of future traffic conditions is impractical for these plans and they have not been included in traffic summaries with other alternates.

B. Existing Controls

There are four major areas along the existing highway within the project limits that frequently operate at or near capacity. These sections are controlled by intersections at Rio Road, Carmel Valley Road, Ocean Avenue and Carpenter Street. Operation near the Carmel Valley Road intersection is also limited by narrow roadways.

\* \* \* \* \* \*

D. Available Options

There are three basic methods that could improve the traffic operation.

1. Enlarge the existing conventional highway system.

2. Convert the existing conventional highway to a freeway.

3. Remove through traffic to another facility and leave the existing highway for local traffic.

Enlarging the existing highway facility is represented by Alternates 3, 4, 4 Modified and 6.

Converting the existing highway to a freeway was proposed in 1955 at a Public Hearing before the California Highway Commission. It was determined that this plan was unacceptable to the community. Development along the existing highway in the following 30 years has now made it impractical to convert it to a freeway.

Removing through traffic from the local traffic is represented by the selected alternate (1C).

The only area now available to construct a new highway is through Hatton Canyon. This highway route was adopted by the California Highway Commission in 1956. Adjacent land has since been extensively developed. A significant shift in highway location is impractical because of the City of Carmel-by-the Sea on the west and the Peninsula ridgeline on the east.

Once again, LOS C occupies a prominent role in this process.

Another round of comment on the Preferred Alternative followed, culminating *two-and-one-half years later* on October 25, 1989 with the publication of the *first* Final EIS/R by the Department. In the interim, the Department as required by law prepared a written Reevaluation of the project to assess changes that had taken place since the circulation of the Draft *and* to revise the Draft as appropriate to accommodate the extensive public and official input that had been received.

But this gauntlet was not close to over. The FHWA had yet to act. One must not lose sight of the fact that this was a joint federal and state project requiring compliance with the environmental laws of both. Before the FHWA approved the Final EIS/R, it consulted with (1) the federal Environmental Protection Agency, which was responsible for NEPA enforcement, (2) the Army, which had jurisdiction over the wetlands, and (3) the United States Department of the Interior, Fish and Wildlife Service, which was responsible for the Endangered Species Act. Furthermore, the defendants received, considered, and rejected during this period a submission from the appellants which included highway-widening alternatives. All of this delayed federal approval of the final product until October 7, 1991 when the Department certified the Final EIS/R. The document was then the subject of extensive public and official comment, followed by approval of the project by the Commission on November 27, 1991. In light of all of this, Judge Beezer's analysis and conclusions regarding whether reasonable alternatives were adequately considered are certainly sound.

If this extensive process amounts to an ambush, as claimed by the City of Carmel, or a failure of the responsible agencies to take a hard look at the relevant environmental con-

cerns as they worked toward a solution to the traffic problems everyone in the world admits exist, or if those interested in the project did not know what to comment on, then Wonderland is real. To undo this remarkably detailed process based on a groundless claim of surprise by the plaintiffs as to the goal of LOS C would be an absurdity of the profoundest kind. This *entire case history* is the story of an informed and painstaking search for viable alternatives to solve a major traffic congestion problem with as little damage to the environment as possible. To order everyone now to go back and look for more alternatives would add a new episode to the travails of Sisyphus. I cannot conceive of a reasonable alternative that has not been considered to death.

The appellants' claim that LOS C's appearance in the Final EIS/R is a surprise betrays, on this record, a desire not just to make sure that the procedural steps in this project were properly followed, but merely to upset the appropriate decisionmakers' substantive conclusion in favor of the Hatton Canyon freeway. This lawsuit is patently and inappropriately outcome-driven, and the City of Carmel has been a moving sharpshooter as the process has unfolded. The Government's allegation that Carmel has "reversed its position on the Hatton Canyon Freeway five times" is borne out by the record. As noted in the Draft EIS/R, the City of Carmel requested realignment of Highway 1 to Hatton Canyon in 1953. In 1970, the City of Carmel asked that the Hatton Canyon alternative be expedited and, in 1971 that the California State Transportation Commission give it a high priority. As late as 1986, *after* the Draft EIS/R was circulated, the City of Carmel *supported* Alternative 1, the very same alternative it now opposes. I quote a letter dated January 7, 1987 from City Administrator Douglas J. Schmitz to Gary Ruggerone of California Transportation:

> The [Draft EIS/R] is thorough in its analysis of the primary route and the alternatives.

On 6 January 1987, the City Council of the City of Carmel–by–the–Sea considered the Draft Environmental Impact Statement for the Highway One Improvement Project. With one abstention, the City Council unanimously supports Alternative 1 (Hatton Canyon) and Subalternative 1C for the southern portion of the route.

It was not until March 1990 that the City changed its mind.

The Sierra Club finds itself in a similar position, having originally submitted a comment letter supporting the Hatton Canyon alignment as "the only logical long term solution." Two years later, they rescinded their approval in principle, stating that "we no longer endorse our January 7, 1987 draft E.I.S. comments."

The point of these observations about the shifting positions of the litigants is not to castigate anyone for changing one's institutional mind, but to indicate that this was a complicated work in progress during which *everyone* had an ample opportunity to participate in the "hard look" required of the project's proponents. But substantive disagreement with the Hatton Canyon freeway is *not* a basis under NEPA on which this process can be overturned. No matter how many times this limitation on our jurisdiction is pointed out to litigants and lawyers, it is ignored time and time again.

I am unable to fathom on this enormous record spanning four decades why anyone responsible for public funds suddenly in the Final EIS/R would pursue this expensive and consequential project with a target level of service of D, E, or F in mind, i.e., unstable traffic flow at best and stoppages at worst. On this record, LOS C is the only one that makes sense *as a goal.* To quote from the Final EIS/R, "Alternative 1C Modified [which includes LOS C] provides reasonably good service for both through and local traffic for at least 20 years.... None of the other alternatives prevent excessive traffic delays, particularly at the [sic] Carpenter Street." The report also says that, based on existing studies, Alternative 1C would result in 3000 less traffic accidents over a 10–year period than any other alternative, which includes 500 less injuries and 10 less deaths. Alternative 1C is the *only* alternative consistent with the requirements of the California Coastal Act and the Monterey County Local Coastal Plan. Thus, I can discern nothing arbitrary or capricious or illegal about its

selection by these decisionmakers. In effect, LOS C is just another way of saying exactly what the Draft EIS/R Purpose and Need section says: Our goal is to free up traffic. To aim for LOS D or less, which seem to describe the very problem sought to be ameliorated, would seem irresponsible and wasteful.

Attacks like the appellants' on the motives and integrity of governmental agencies are not new, nor are they uncommon. The District of Columbia Circuit confronted a similar baseless charge in *City of Grapevine v. United States Dep't of Transp.*, 17 F.3d 1502 (D.C.Cir.), *cert. denied*, 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994). In that case, a different set of plaintiffs made the same sort of goal-oriented bad faith claims. Wisely, the court said it would "pass over the facile implication that the FAA harbored an improper motive for changing the statement of purpose in the FEIS." *Id.* at 1506–07. The appellants' claim here is nothing more than a similar distraction. They have not unearthed anything that calls into question the bona fides of those responsible for this demanding and unrewarding process.

## II

### THE WETLANDS

Appellants claim that the Final EIS/R understates the impact of this project on some 12 acres (or slightly more) of wetlands, and that the Final EIS/R's approach to the mitigation of such an impact was "inaccurate," "misleading," and "not specific." I respectfully believe that the alleged indicators of such alleged defects pointed to by the appellants-either individually or in the aggregate-fail to support such claims.

The key to evaluating the wetlands issue raised by the appellants is to use the right approach. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 350, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). "NEPA merely prohibits uninformed-rather than unwise-agency action." *Id.* at 351, 109 S.Ct. at 1847. Based on this principle, for example, NEPA would not have been violated in this matter if the agencies, after complying with the Act's procedural prerequisites, had decided that the benefits of the proposed freeway justified this project notwithstanding a significant loss of existing wetlands area. *See id.*

Our precise marching orders as to the discussion of the mitigation of environmental harm are spelled out in *Methow Valley Citizens*. They are as follows:

> There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.... It would be inconsistent with NEPA's reliance on procedural mechanisms-as opposed to substantive, result-based standards-to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

*Id.* at 352–353, 109 S.Ct. at 1846–47; *see also Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517 (9th Cir.1994) ("NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated."). It would be a mistake, therefore, for us to approach the wetlands issue asking whether the proposed mitigation measures meet anyone's substantive expectations or to base our evaluation of this EIS on whether its proposed mitigation features amount to a "fully developed plan."

Thus, we look at the Final EIS's handling of the wetlands aspect of this project and ask only (1) if it adequately arrays for the public and for the decisionmakers sufficiently detailed information concerning significant environmental impacts on the basis of which an informed decision-including mitigation-can be reached, and (2) does its presentation of the relevant wetlands information serve NEPA's "action-forcing" purpose? *See Methow Valley Citizens*, 490 U.S. at 349, 109 S.Ct. at 1845. In other words, does it contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences?" *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982).

Chapter IV of the Plan is entitled "Environmental Consequences." No. 3 of this Chapter tells the reader that Alternatives 1B and 1C Modified will "remove" approximately 11.95 acres of wetlands. "Remove" means to get rid of. I do not understand how the impact of this alternative on wetlands can be said by the appellants to be ambiguous or understated. To quibble at the margins about the precise acreage is irrelevant because the freeway is going to wipe out or materially rearrange virtually all the wetlands in its path. This statement surely informs the public and the decisionmakers of the environmental consequences of this Alternative, as it does in turn about all the others; and it is certainly "action-forcing." A chart is present in the Plan comparing the environmental consequences of the numerous Alternatives against each other. Anyone reading the document cannot miss this relevant information. The document itself underscores its importance, and in so doing it appropriately shifts from damage to the wetlands to mitigation of the same:

Riparian wetlands are identified in the Greater Monterey Peninsula Area Plan as a limited habitat, and the Carmel River riparian is considered to be of "critical importance" in the prevention of riverbank erosion. The loss of an additional 11 to 12 acres of riparian wetlands under Alternative 1 is considered significant.

Accordingly, the Plan then describes "Proposed Mitigation Measures," described clearly and explicitly as "conceptual." The most significant aspect of these measures is a commitment to [replace] riparian wetland habitat on at least a 1:1 basis. The proposed mitigation would compensate for acreage impacts to existing palustrine wetland and palustrine emergent resources and would fully meet the FWS [Fish and Wildlife Service] Resource Category 2 Goal of no net loss of in-kind wetland habitat values.

This *conceptual* Mitigation Plan, which must be read in its entirety to get its full impact, calls for the establishment during freeway construction of an ESA, or a fenced-off environmentally sensitive area, "which the contractor would be prohibited from using . . . for any purpose." The Mitigation Plan then makes detailed provisions for the re-

placement and enhancement of both "on-site" and "off-site" wetlands. These provisions go so far as to specify the types of trees-eight different kinds-to be planted in the affected areas and even require that the areas designated as sources for the cuttings "not be 'clear cut,'" and that only "insect and disease free willow cuttings would be used." Moreover, after approval by the FWS, the off-site riparian wetland replacement plantings are scheduled to be "in place at least one year *prior* to the start of construction activities for the proposed highway improvement." Management of this restoration plan is assigned to the Monterey Peninsula Water Management District under a Cooperative Agreement with CalTrans, to be monitored for five years with the preparation of annual reports. Finally, the Mitigation Plan includes "a contingency plan which will identify *additional mitigation measures and/or sites* that will be utilized should all or part of the proposed mitigation fail," all of this at a cost of $850,000.

Even with all of this detail, however, the Final EIS/R pulls no punches when it sums up what is happening and why:

The proposed mitigation measures are intended to re-create forested riparian wetland habitat similar to that which would be directly affected by the highway construction. With the replacement plantings at greater than a 1:1 ratio, and the start of the off-site and most of the on-site replacement plantings at least one year prior to the start of highway construction, the proposed mitigation would insure no loss of riparian wetland acreage or habitat value. Even with proposed mitigation, the impact to riparian wetlands from Alternative 1 is considered significant. The riparian wetland, with associated upland in Hatton Canyon can not be duplicated to fully provide in-kind replacement of habitat values. There are no practicable design variations of Alternative 1C Modified that would reduce or avoid wetland impacts. The width of Hatton Canyon is less than the width necessary for the roadway. Further cutting into the east wall of Hatton Canyon could result in a slight reduction in wetland impacts, however, the additional cut

would require the taking of additional acres of Monterey Pine Forest, all of the rare Hickman's onion preserve, and several residences. The substantial impact of this design variation, to preserve a minor isolated portion of riparian wetland is not practicable.

South of Carmel Valley Road, the canyon opens up to the Carmel Valley. At this location, the width necessary for the Carmel Valley Road Interchange and associated ramps are restricted by the existing highway on the west and the Carmel Rancho Shopping Center on the East. The portion of the Hatton Canyon drainage (and associated riparian wetland) would be covered by the fill required for the interchange and ramps.

At the Carmel River, the bridge on the new alignment has been designed with a minimum of disturbance to the existing river levees. The bridge will also be designed with the maximum possible span to minimize the number of pilings required in the Carmel River. No further design variations are available to further reduce wetland impacts at the Carmel River.

A Wetlands Only Practicable Alternative Finding has been prepared for Alternative 1C Modified (See Exhibit K).

Exhibit N to this document is a letter from the FWS dated October 30, 1989 which approves the Mitigation Plan *in concept* as adequate to replace the lost habitat but points out that "formal approval must wait until a detailed plan is completed." Noteworthy in this letter is a suggestion for a contingency plan, a suggestion which was later adopted in the Mitigation Plan itself.

A number of important things literally leap off the pages of the Final EIS/R.

First, the impact on the wetlands is adequately stated.

Second, anyone interested in the project and intending to comment was surely informed as to all of its environmental consequences.

Third, the document is extraordinarily sensitive to the wetlands, *providing for a 1:1 replacement ratio* including using insect-free cuttings.

Fourth, the plan is absolutely flexible and proposes to respond to any changes or unseen contingencies.

Fifth, the wetlands impact is plainly measured against all the alternatives, and a reasoned judgment rendered in the required finding of "Only Practicable Alternative," appearing as Exhibit K. In essence, it was the informed judgment of the decisionmakers that the other alternatives simply do not deliver the transportation goals of the project, and that "there are no practicable design variations of Alternative 1C that would reduce or avoid wetland impacts."

Accordingly, I find no merit in appellants' claims that there is currently more wetland acreage in the affected area because of the Loma Prieta earthquake than was considered in the process. The Mitigation Plan's admirable commitment to a 1:1 restoration ratio in concert with the contingency provisions and management program are more than adequate to take care of any changing conditions. The Mitigation Plan "ensures that important effects will not be overlooked or under-estimated only to be discovered after recourses have been committed or the die otherwise cast." *Methow Valley Citizens,* 490 U.S. at 349, 109 S.Ct. at 1845. This is also true of appellants' claim that the information regarding the wetlands is now stale. Because the Mitigation Plan is conceptual, flexible, and contingent, it will necessarily and properly deal with evolving conditions. Appellants complain that the plan is not specific enough, but its genius is that it is responsive and flexible. Moreover, the permit process will iron out any wrinkles it may have. In any event, the process certainly satisfies *Methow Valley Citizens'* requirement that mitigation concerns be presented in sufficient detail to address and to evaluate the environmental consequences of a project.

Again, one cannot help but glean from appellants' arguments that the core of their disagreement with this project, as I mentioned earlier, is the final determination of the decisionmakers to build this freeway, and that the appellants' alleged procedural complaints when closely scrutinized turn out to be simply sheep in wolves' clothing.

## III

### CUMULATIVE IMPACTS

The district court's Order gives us a significant key to deciding whether the cumulative impacts of this project have been considered as required by law. The district court said, (1) "Plaintiffs have failed to identify any other actions that might have an impact on the Monterey pine forest affected by this project"; and (2) "Plaintiffs have not identified any other actions which might have an impact on wetlands. Absent such actions, the EIS need not discuss cumulative impacts." Accordingly, with the burden on the plaintiffs to show a violation of NEPA in this regard, summary judgment was proper given no showing of specific cumulative impacts on either the pine forest or the wetlands.

Nevertheless, the final EIS/R did adequately discuss cumulative impacts regarding the pine forest, stating that

The native Monterey pine forest in Hatton Canyon is part of the largest of the three remaining native Monterey pine populations in California. The Monterey population is rapidly being reduced in size and integrity by the urbanization of the area. The extensive removal of native Monterey pines without replacing them, suppression of natural fires, and the extensive use of Monterey pines of unknown genetic origin in landscaping have all contributed to the loss of the native populations. The introduction of Monterey pines of unknown genetic origin has the potential of producing mixed populations that are more vulnerable to insect attacks, disease and environmental stress than are the native populations.

The special circumstances surrounding the remaining native stands of Monterey pine has led to their placement on the California Native Plant Society's Inventory of Rare and Endangered Vascular plant (1988) as a species of limited distribution. The impact on the native Monterey pine forest is considered significant.

SAR 25:7789 (FEIS IV:30).

Moreover, other parts of the Final EIS/R also discuss this subject, notably in Chapter VI which is entitled, "Environmental Consequences, Cumulative Impacts." In this separate chapter, the document takes note of the combined adverse environmental impacts of this project with the "ongoing urbanization of the Carmel area." The document says,

These adverse cumulative impacts are the result of the combined impacts of many types of activities and are not solely attributable to the proposed project alternative. Both non-transportation and transportation related projects must be taken into account when evaluating the cumulative impacts to resources. Examples of non-transportation impacts include those generated by major residential and commercial development and land use changes. As discussed previously (Growth Inducement Analysis) other development projects in the Carmel area are expected regardless of whether or not one of the proposed project alternatives is implemented. Should one of the alternatives not be implemented there would be no noticeable reduction or avoidance of cumulative adverse impacts. *This is due to the relatively small contribution of the proposed project alternatives to the cumulative adverse impact on the area resources.* In fact, each of the project alternatives would result in some improvement in traffic conditions (emphasis added).

The summary of this chapter is as follows: As discussed earlier, measurable project impacts on sensitive resources such as water quality, floodplains, natural vegetation, and endangered species habitat could have the potential for adding, to some degree, to the overall cumulative impacts on that resource. However, mitigation developed for the individual resource impacts, as discussed in the Environmental Consequences section of this document, will even further reduce the project's potential contribution to those cumulative impacts.

Finally, the majority bases its remand in part on the absence in the excerpt of record of the Carmel Valley Master Plan EIR which is explicitly incorporated by reference in and thus is part of the Final EIS/R's chapter on cumulative impacts. What the majority seems to have overlooked is the fact that the district court formally took judicial notice of this and other relevant Plans on pages 6–9 of its Order dated 5/12/94. Thus, if we are

concerned about the precise content of the Carmel Valley Master Plan and its Cumulative Impact Section (I am not), the remedy is not to remand but to ask the parties to supply us with the judicially-noticed documents *which are already part of the record.*

In summary, I conclude that the Final EIS/R's discussion of cumulative impacts was not defective.

## CONCLUSION

Any person even remotely familiar with the environmental havoc existing in industrial countries without environmental protection laws must fully support our nation's laudable efforts to preserve for ourselves and our children the outdoor wonders of the great country in which we live. But, *too much of* anything can be trouble, and one can only wonder if this case and the tortured history of this traffic amelioration proposal suggest that too much process now renders any controversial project too difficult and costly to accomplish, regardless of its merit. After all, it is highly probable that a sizeable majority of those persons who almost 50 years ago in 1947 identified this traffic problem are no longer with us. Homer, if writing The Odyssey today, might well substitute for the King of Corinth's boulder and hill the daunting task of pushing this traffic congestion initiative to completion.

Thus, I concur in all aspects of Judge Beezer's excellent majority opinion except for one. I do not see the need to remand this matter for further consideration. I would affirm the district court on everything.